We have been told that one of the counselors is missing, but I'm glad you're all here now. Good morning, Your Honor. It's Donald Cook for the plaintiffs and the appellants. By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts. Who was dumb enough to say that? I don't know. I was looking around for that person. Probably Keith's, you know, it was so well, so well phrased. I think it must have been Keith's. Something about a rough beast slouching towards Bethlehem to be reborn. Yeah, something like that. Was he laughing at me? For the audience, he's quoting me. I have written extensively on informants and I appreciate your googling up my comments. It wasn't Google. Look, we've got this one page affidavit. It relies entirely upon an informant. Mistakes the fact, right? This is not a controlled buy. You might think that reading the affidavit, but it's not a controlled buy. No reliable information is offered to show that this informant is reliable. It's not revealed that this is a criminal informant seeking, obviously, a break, a deal. It omits the fact that the criminal informant is not telling the truth. And by the omitted facts, of course, I'm talking about the fact that, you know, this is the kind of argument that would probably, you know, would have would cut a lot of ice in a suppression case. But we're not in a suppression case. We're in a 1983 case. And we really cannot be applying a standard where if the police get it right, they get the evidence in. And if they get it wrong, not only does it get suppressed, but they have to pay damages. We give them quite a bit of leeway. And what I hear you arguing is evidence should have been suppressed. But that's a different case because there was no evidence to suppress. I disagree. I think the standards on determining whether under federal law that there are material misstatements in the warrant, where the material information is omitted, is the same, whether it's criminal or civil. Now, obviously, because it's a 1983 action, you have an issue of qualified immunity. But I think for reasons already stated in the brief, that's going to fail. But I strongly disagree that the first inquiry, whether there's a violation here, is different, whether it's a criminal or a civil case. So your position is wherever you would suppress the evidence, every case where you suppress the evidence, you have met the first prong of a 1983 case. Oh, I would agree that where you've got a grant of suppression motion, necessarily under federal law, there's been a finding of a Fourth Amendment violation. And a Fourth Amendment violation, right, is a predicate or one of the predicates for a Section 1983 claim. Now, it doesn't mean the officer is going to be held liable or the city is going to be held liable because, of course, there's already going to have a lawsuit on their hands, for sure. Well, you know, as a practical matter, you go into court on a 1983 claim representing someone who was trafficking in drugs and had all the evidence thrown out because, well, you know, it was a bad warrant. You're not going to get a whole lot of sympathy from the jury. Juries, notwithstanding law and order episodes, don't buy into legal technicalities, which is how that type of suppression hearing is considered by most people. But here we have a case that really emphasizes the importance of why you've got to have reliable information. There's no claim here that Randy Diff and his family were involved in any of this alleged criminal activity, right? I mean, fact is, is that this is probably something fabricated by this informant. That is that there was somebody in this particular unit because Diff had been living there for a year. The utility bills were in Randy Diff's wife's name. And there was no information from anybody other than the informant that this six-foot Hispanic male called Negro was anywhere in the area. So this warrant fails, which is why it was suppressed in the state case. And if you are ---- Roberts, that's a question that I have. I've got the minute order from the municipal court that says rather obliquely, people in defense submit on motion to quash granted. Can you ---- is there anything in the record that explains why the motion to quash was granted? Were there some kinds of findings? Was there any kind of testimony? I mean, what was the basis on which this warrant was quashed? There's no further information in the record I can cite you to, Judge Trott, other than what you're looking at in the minute order. I can tell you my surmise, and my surmise is simply that the prosecutor in that case looked at the warrant and realized it wasn't going to fly. One of the basic problems of many in the warrants, one of the basic problems is you read the affidavit. You wouldn't know that this is an apartment building. Of course, if it is an apartment building and you know that, then you wonder, well, what apartment is this alleged criminal activity taking place at? You can't tell from the affidavit. And I submit a magistrate would want to know that, if we want to know it's an apartment building, because obviously you've got to focus on the particular residence. I mean, was it quashed because it was some kind of misconduct? Is this a Leon problem? They tried to stop something by? I mean, it's just ---- I don't think personally, I don't think it got to the point in a criminal case where there was any kind of a finding that an officer committed misconduct. I think it was just ---- There wasn't a, was there a Frank's motion? I mean, it just ---- It was, Mr. Dith, as the criminal defendant filed the motion, the people didn't oppose it. It wasn't opposed? It just said submit. I don't, I can't tell you, I don't think there was an opposition filed by the people, again. I was looking, well, maybe there was a Frank's motion, and the judge concluded that there were material misstatements of fact or misleading of the magistrate such that the whole warrant crashed and burned. I mean ---- I don't think, I'm sure there was no hearing. There wasn't testimony taken in the criminal case. I think, again, it was an instance where you look at the warrant, and it's like one of the problems that jump out is that once you realize this is an apartment building, you look at, not the warrant, at the affidavit, there's a big problem. Yeah. Right? Well, I guess we could surmise. I was just looking at it. That's the only thing I could find in the record that explains what happened. Two words.  But when you get into it, it's like the problems multiply, they compound, and then when you take the testimony of the officers, I mean, we've got the affiant Romero stating that Detective Cooper, he states under oath, Romero, that Detective Cooper told me, he watched this whole buy transaction occur, and I take Detective Cooper's deposition, he says, I never saw it happen, I didn't see any of it, and I never told anybody. I mean, if you believe Detective Cooper, Romero committed perjury in his deposition. So, well, if I have to go on, then I haven't, then it's pointless, because I shouldn't have to explain what I believe is apparent from the warrant. You don't have to explain anything, but Judge Anderson says here that the death's assertion that the warrant was quashed for lack of probable cause, so the death said the warrant was quashed for lack of probable cause, and Judge Anderson assumes that's okay, I'll buy that, and goes into a qualified immunity. Yeah. Well, you don't get qualified immunity here because... What's the flaw in Judge Anderson's analysis? Flaw number one is the false nature of the affidavit itself. It describes what you might think is a controlled buy. In fact, it's not a controlled buy. There's this Sylvia person, this unknown person, comes into this whole transaction contrary to what the plan was, right? The fact that the transaction was never observed by anybody other than the informant, who was a criminal informant, none of which is revealed to the magistrate in the affidavit. That's two or three basic flaws right there in Judge Anderson's analysis. The fact that it's not, the magistrate is not told in the affidavit that this is an apartment building, and therefore you've got multiple units, and therefore it has to be probable cause for a particular unit, not... But that's how the warrant describes it. It's a two-story building, it's an apartment in the second story. On the warrant itself, there's a description. In the affidavit, there's not. You look at the affidavit for the probable cause. You don't look at the... The magistrate judge is looking at the affidavit. He makes, he's a neutral dispatch, neutral, detached judicial officer. He's making determination of probable cause. He looks at the affidavit. If sometimes if the warrant itself is vague, you can look at the affidavit to fill in the details. But it doesn't go the other way, right? Because the magistrate has to rely on this affidavit. So they don't get qualified immunity. And when you go to California law, it's an even easier case, because under California law, you don't just strike the material information or the... Not only do we suppress it, but there's no qualified immunity. You're relying on the warrant issued by the magistrate. I find that a very difficult proposition to accept. I mean, here the officer doesn't act on his own. It's not like he acts on his own, makes a mistake, or takes an unreasonable position. But he goes to a judicial officer, presents as a judicial officer, who presumably knows a lot more law than the... or should know a lot more law than the police, says, okay, this is fine, approves it. Officer relies on it and finds himself unreasonably relying on... I don't remember a case where somebody's been found to be lacking qualified immunity because of relying on a judicial officer. Are there such cases? You've got to go down the Leon Road to show that they're not entitled to use good faith. That's the first road you go down. Or you can take a Franks Road down there. Those are all suppression cases. Well, if I can answer... I know I'm out of time. But in response to Judge Krasinski's comment about you don't know of a case, the case we cited in both opening and reply briefs is the Green Street v. County of San Bernardino decision, a Section 1983 action, where Judge Stotler held that the warrant was... it was a search warrant case, held that the warrant was sufficient. Plaintiff appealed. This court reversed, finding that the warrant, probable cause, was insufficient as a matter of law, that the magistrate's decision in this state court action in issuing the warrant did not insulate the officer from liability and as a matter of law that the officer was not entitled to qualified immunity because the warrant was so patently deficient that no reasonable officer should conclude that it was adequate. See that? That's the... you're going down the Leon Road there. That's the Green Street decision. And so that... 1983 case? Hm? 1983 case? Section 1983 action. My colleague, John Burton, tried the case. So where you have a warrant this deficient, this inadequate, you don't get qualified immunity, and where you go to the... when you go to the California state law claim, there is no qualified immunity, period. Furthermore, you strike the affidavit in its entirety under California law, which means that the city is liable as a matter of law because the respondent is superior under California law claims. I'm out of time. I, of course, invite more questions. Before we hear from the defendants, was the Green Street case referenced by Judge Anderson before I dig through this whole thing again? I don't know, but I don't think so. I know we cited it to Judge Anderson. I didn't remember seeing it in his opinion. Good morning, Your Honor. Stephen Renick of Manning and Martyr Castle, Rod Ramirez. Just to address the question that was asked earlier about the suppression hearing, there actually is evidence in the record as to what happened. It's on page 875 of the excerpts of record. It's volume 4. It was submitted as part of the evidence regarding the motion for reconsideration. What was this on page 75? On the motion for reconsideration. 875, yes. And it's... 875? Yes. It's Judge Dreeh's explanation as to why he was quashing. Basically, my interpretation, just from reading this, is because there was no explicit apartment number given, he found it deficient on its face and therefore quashed it. We don't trust, but verify. This is your explanation. Exactly what did he say? Reading from line 16, on the arrest report it's noted that the location was 838, 9306 Elmless to Drive,  and nowhere on the search warrant is the apartment number placed in the report. And the search warrant, you are supposed to be able to give the search warrant to any law enforcement officer and they can go to the exact location. It's a multi-unit, two-story complex, several apartments, therefore the motion to quash is granted. Got you. If you'd like me to discuss it, our argument in the reconsideration motion was that, to be blunt, that Judge Dreeh's was wrong, that the description that was given in the search warrant was sufficient, and that it identified one and only one apartment at that location. Well, but a political counsel points out that you can cure a vague warrant with a more specific affidavit, but not vice versa. You can't have more specific information in the warrant that's not supported by the affidavit. So you've got this more specific description in the warrant, but there's no evidential support for it. And that's true, though. I have to admit a certain level of confusion, personally, as to the warrant and the affidavit, because they seem to be a single document that the evidence says was prepared by Officer Romero himself. So I don't know that Officer Romero saw himself as creating two separate documents. There's certainly nothing, you know, like even a header saying affidavit versus search warrant. The portion that has the probable cause, which I suppose is what we're talking about as the affidavit, simply has a header probable cause in the same type and same format as location, as persons. It just seems to be different headings of the single document that was prepared. So I think it's difficult to argue that Officer Romero thought he was, you know, creating a separate affidavit, which would have to be exclusively relied on by the magistrate, as opposed to the formal warrant. I think the evidence indicates that he was creating a single document, which he handed to the magistrate in good faith as saying, here's the information, here's what I want, is it okay? And I think if there's error there, it's the sort that's covered by qualified immunity. It's certainly nothing where there's a sort of obvious failure. I think it would be hard for anybody looking at that single document to say this is affidavit, this is warrant. Well, I don't have any difficulty. The first page makes it quite clear what is the warrant and what is the affidavit. It starts off with affidavit. It says, I, Ralph J. Romero, swears under oath, and so on. And then there is a second part, and he signs that, and then he says search warrant. So there's no doubt there. And then he has certain things that say attached. Now, the probable cause part, which is Exhibit C, where is that referenced on page one? I'm sorry, Your Honor, could you tell me what page you're looking at? I know the warrants. It's page 64. It's page 64 of the excerpt. Thank you. You know, there just, again, this just seems to be a single document. There doesn't seem to be anything. Well, do you see where it says affidavit in parentheses? No, Your Honor, I apologize. Look at the very top of the page. It says it was received by the State of California, County of Los Angeles. Yes. Underneath is search warrant and affidavit. And then it says affidavit. And then it says, I, or rather blank, filled in as Ralph J. Romero, swears under oath, and so on. And there's a bunch of words there. And then a signature line signed by the defendant. And then it says not search requested. And it says no. And then it says search warrant. And then following the word search warrant, there's a bunch of printed words with Xs in some of the categories. And then there are certain rubrics where it says C attached. Yes. Okay. So the C attached is as to the location. And that's the first attachment. Yes. And then there's another attachment, which is exhibit C, which says probable cause, which is a freestanding one, two, three, four, five paragraphs. Yes. And what I am not seeing is where is that reference on page 1?  I feel like I'm doing my opponent's job. In the second printed. You don't have to answer. No, no, no. You don't want to answer. No, no. You know, it is what it is. In the second line of the affidavit portion of the document, it says search warrant. And in the attached and incorporated statement of probable cause. Okay. There it is. Okay. So I don't understand. What difficulty do you now have in figuring out what is the affidavit and what is the search warrant? What exactly is your difficulty here that you expressed earlier? Personally, I hadn't noticed that until we began this colloquy. So your difficulty has been cleared up. Well, in this courtroom, under these circumstances, it has been cleared up whether Officer Romero understood that there was this sort of fine distinction between the attachments. I don't know. I guess. I am not sure what relevance that is one way or the other. But I don't see where is fine distinction. I mean, these things are perfectly clear. There are two things. There is an affidavit and a search warrant. There are certain things incorporated by reference. And there doesn't seem to be any ambiguity here. There isn't on its face. The ambiguity comes, to me at least, in trying to understand why would Officer Romero have created the document in this way. He has a very specific location. You know, this gets us back to that case from Supreme Court a couple of years ago. Remember when they put in the description, you know, the things to be seized? And they put the address of the. It's not. It's just Supreme Court. It's not that important. And you could ask the very same question. Why did the officer in that case do it? But the answer is he goofed. Made a mistake. Yes. And what we held is he gets liability. It was 1983 liability. And we're appalled by the Supreme Court when you make a mistake like that because warrants are precise things. They're sort of like surgical tools. They can cause great harm. They can do great good as well. But if wielded incorrectly, they can cause great harm. And so you have to be really, really careful in wielding them. And why isn't the fact that he doesn't have the address, the specific address in there in the affidavit portion, in the sworn portion of the warrant, why isn't that kind of defective? I think to go back to some comments that were made during counsel's brief, that certainly is a valid and perhaps decisive argument on the suppression motion. The question here is, is this the sort of mistake that goes to the extent of justifying liability? Officer Romero gave this information to the magistrate. The magistrate did not put in this address. The magistrate did not, you know, add in some other information from outside or just make this up or whatever. This was part of the package that was given by Officer Romero to the magistrate. Obviously, if Officer Romero had thought this description needed to be on this page as opposed to this page, he would have. He's the one who presented it to the judge. The problem that is created here is not one of a lack of information. It's sloppy drafting. And while that may be a death sentence in a suppression hearing, because we have an entirely different standard at the criminal level, should he be held liable, financially liable, because he did a crappy job of putting together his package to the magistrate. There's no question here that he identified the apartment. There's no question that he's the one who provided that information to the magistrate. As I understand the whole idea of qualified immunity, it recognizes the fact that police officers are not perfect, that they do make mistakes. Clearly, the magistrate who received this was not overly concerned by this. He took the entire package and issued the warrant. Now, of course, judges, magistrates make mistakes. But this is the sort of mistake that one can see occurring just, you know, as the normal course of, not practice, but the normal course of things happening where mistakes happen. Kennedy. I want to spend a minute or two discussing the other part of the Judge Anderson's ruling, which I'm not going to announce. Is there something specific? I think he was right. Why is there? Go ahead. Go ahead. How do you justify the ruling? It seems wholly implausible and unjustifiable. I think you have to start with the declarations of Mr. Dith himself. Okay. Let's do that. I think the way it has been presented in the briefs and in the lower court was that Mr. Dith was trying to say, I didn't hear anything, I couldn't have heard anything, I would have heard it if there had been this knock and notice. They never says that. And there's nothing difficult about making that sort of clear-cut statement. We even have a situation here where there are two declarations. I have no idea what you're talking about. I'm sorry. You know, it sounds to me like you are sort of talking. Let's see. We've got the affidavits. Just pull them out and show me why they don't say exactly what the disclaimer says. I believe. You've got the affidavit? Not in front of me, Your Honor. Well, why not? You don't think we talk about it today? I have it. I don't have it physically in front of me. Do you now? I have the first one, I believe. Well, we're going to talk about both of them. Why don't you go pull your excerpts and let's take a look at them. The one is on excerpts 498. The other one is on excerpts 60. OK. I believe they're both in the first volume of the excerpts. Yes. Oh, no, no. I'm sorry. The first one is in 60 is in the first line. And then 498 is. Yes. I have them now, Your Honor. Yeah. OK. So talk to me about the affidavit. Now, that position says, look, what we said is we could hear if somebody was knocking on our door, we could hear it. And nobody knocked. And then here they are saying they first thing I heard was people knocking down the door. And before I could reach for my gun, the police were on top of me. And I felt a cold object put to my to my throat in my head or something. Well, in in the Senate. What's unclear about that? Well, in in the second declaration at 498 at six and seven, Mr. Gibbs says, I could hear someone knocking on my front door from my bedroom. I could hear someone talking at the front door. That sounds like him saying I did. I could hear someone talking. And so I reached for my gun. Judge Anderson read it that way. There's not there's nothing in the affidavit that's references specific events of that day. There's not a single thing in this affidavit that this all has to do with the nature and location of the premises. There's no reference to the date. The date is not mentioned. The event is not mentioned in this affidavit. I'm sorry. We're talking about the first declaration. I think I have to disagree. Your Honor. All of paragraph three is about that day. I could not identify which defendants caused the damage to my house. I was inside our apartment when the defendants broke the glove compartment. I was in the living room when they broke the bed. All of this is referencing that event. And immediately before that is OK. No, but on the other hand, it's there's a logical flow from I was, you know, I have this apartment here. And I could hear somebody. And then, boom, all this terrible stuff is happening. I guess the answer is, yes, it could be read either way. The point is that this is a this is a declaration that was meant to clarify apparent ambiguity in the first one. And rather than a very simple, straightforward statement that I did not hear anybody at the door, I would have heard them if there had been a knock notice. We get a statement that actually seems to get moved closer to I did hear them. Isn't that what we have prior to fact to untangle these things? Well, but what we're saying then is that the plaintiff himself has created a dispute of fact by submitting two ambiguous declarations. As far as I'm aware, that has never been the the state of the law. The dispute has to be between the respective versions of events that has to be resolved. Here you're asking where we're suggesting that a jury has to decide, you know, what which of Mr. Diff's own statements as to what happened should be believed. Is there a rule that if an inconsistent statement is given by a declarant, you throw both of them out? Isn't the rule that if there is some reasonable basis upon which a jury could find that sufficient? Secondly, another one I haven't even mentioned. Tracy Martinez stated that she was watching the stairway from the driveway after she came out of the laundry room and there was no knock and announce. And Mr. Warford went back and did a lot of photographs and stated that if you were ninety nine to 90 feet from the door, you could see the apartment B which was gone into. And there's no indication that Miss Martinez was anywhere other than within sight of the door. There is. So there's a material fact. I did not hear a knock. I did not hear a notice, says Martinez. And she no deposition taken later from her saying I was wrong when I made a declaration. Why isn't that creation of material fact? Because I agree that with your description of of how her testimony could be looked at. The problem that that springs to mind is timing. Miss Martinez also explained that she was told by I'm not sure who the person was, a friend, a relative, whatever, that the police in the driveway, which is what caused her to exit the laundry room and go out. So the fact that she didn't see police not enter doesn't necessarily mean that she was observing the actual initial entry into. Let me tell you, let me read you. I watched the police run up the stairs leading to the two upper apartment units and break open the door of this apartment. I saw the police go inside the apartment. I did not hear the police knock on the door before entering this apartment. I did not hear the police say anything before going into this apartment. I apologize, Your Honor, I did not remember her saying that she saw the police were inside this apartment. I heard them say in a loud voice police. Why isn't that a tribal issue of fact? I'll be honest. I don't I don't necessarily have an answer for that. But I would I would then make the comment that the motion that was filed. Sought not simply summary judgment in total, but partial summary judgments of the various counts. If what we're talking about is a failure of Judge Anderson on this on the knock notice issue, then we would suggest and request that that be the only portion that be reversed. Beyond that, we believe he was correct on the other aspects of it. He does sort of cast doubt on the rest of his analysis. I mean, he seems to go way out of his way to try to create a doubt for nonexistence on this knock. I mean, it's going to be perfectly clear cut. Sure, you can sort of squeeze these things for some ambiguity that's not there. I have no idea what this what the stunt for the photographer meant, you know, and how that could possibly defeat the Martinez declaration. All you've done is impeached her, which is what we have time for. You can put the witness on the stand and show with photographs that she shouldn't be believed, but it couldn't possibly win on summary judgment. And yet, well, I think seems to have swallowed it whole. I think that's because I can't obviously accept the characterization, but I think the attempt with Mr. Warford was to show physical impossibility, not simply impeachment, but to show that Ms. Martinez's testimony simply could not be. But it doesn't do that because Ms. Martinez doesn't state how far she was away from the stairway. And I'm not going to dispute that. I think there is that issue. But in terms of Judge Anderson. But beyond that, it depends on believing this witness as opposed to believing her. Even if there were a direct conflict, even if she said, you know, I was 90 feet away or I was 100 feet away or 150 feet away. Okay, we then have to take this photographer and assume that he's the same height as she is and when he's taking pictures, you know, he's taking it from the same vantage point where her face, her eyes would have been. There wasn't some other position 150 feet away. You know, he didn't just find the one place 150 feet away where he couldn't see it. And if you moved 150 feet away still but, you know, somewhat to the left or to the right, you still couldn't see it. I mean, it all depends on believing him on a non-cross-examined, non-impeached, you know, with no opportunity to present contrary evidence. I mean, it's a very clumsy effort and I'm surprised counsel tried it and I'm even more surprised that the district judge fell for it. I, you know, sort of cast doubt on the rest of his analysis. I just have to say I don't think Judge Anderson was going beyond anything but he seemed to be convinced whether, you know, we let him down a garden path. I don't know. Psychological matter. It does not help. But as the rest of his analysis. I when there is self egregious error in one part of the analysis, you tend to look more skeptically to the rest of it. Just for future reference. Thank you. OK. I know I'm out of time on the on the sufficiency of the. We'll give you a minute. How about a minute. How's that. That'll work. OK. It's more than just there's no address specific location in the affidavit. It's the not offering any information verifying that this informant is reliable, not revealing the fact that it's a criminal informant and therefore is seeking a favor. The fact that did not provide the information that supposedly Romero did a check to verify that a Negro lived at this residence. And he said he found no information indicating otherwise. Or according to the records, utility records, he would have found that the disk lived there. That wasn't provided in the affidavit. That is, he did a check. Check the utility records, the DMV records and found no information. You make a fair amount of that. But let's say he had checked the utility records and he'd seen that somebody by the name of this lives there. I mean, he wouldn't necessarily know who this was, whether, you know, this is an alias for Negro. I mean, Negro is not really a name. It's a it's a it's a it's a nickname. Right. True. I mean, I don't know where that would have gotten him. As he explained it, you take the utility information, you go to the next step and you check the DMV records. It's from the DMV records that you find information about, you know, photograph, ethnicity, weight, height, that sort of thing. And in her declaration, she states, Mrs. Diff, that, you know, I'm five foot one Cambodian and I've got a driver's license. And I live at this address. And from the utility records or the DMV records and what you're finding. Let's go down that road. Let's assume that that's what he finds. So he does this investigation for the investigation. He figures out that living at that address is a Cambodian cop. A couple obviously doesn't meet the description. Now, does that preclude the possibility that they have a house guest or a criminal confederate or somebody who comes there and does business? Absolutely not. The point is, you put that information in the affidavit so the magistrate can make that decision as to whether or not there's PC to search this residence. Just like you put in the information that this particular informant is a criminal informant trying to seek a break on the deal. And you also put in the affidavit the fact that this buy transaction between Negro and the informant was never witnessed by anybody. That the sole source of that information was from the informant. And, in fact, that this whole so-called controlled buy was not a controlled buy. It went sideways because the informant brought in this third-party Sylvia and the police let her go ahead with the transaction and then let her drop off the unknown person. You put that information there. If you succeed in convincing us that you're right, that the warrant itself is bad, then you have damages that flow from that, I suppose. If you fail to convince us and you only survive on the not-going-to-announce part, what kind of damages are you entitled to on a warrant where there's qualified immunity on the warrant itself, but the only thing you're looking at is the failure to knock and announce? How do you measure damages on that? You have to look at the state law claims then as well. Because if you find a constitutional violation of the qualified immunity on the state law claim, there is no qualified immunity. And the cases are cited on the briefs. So there would be damages on the state law claims for the whole entry and search, et cetera. And the city would be liable and respond in superiority. If you're just looking at the federal claim, then you're looking at the general damages for failure to give knock notice and the destruction of property that Mr. Diff described in his declaration, the unreasonable nature of the search itself. Thank you. Thank you for the additional time. Okay. Thank you. Okay. I'm sorry. It was time to move. All right.
judges: Kozinski, Trott, Bea